IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CHERYL MERCADO-ROSA, *et al.*,

   Plaintiffs,

       v.

NELSON TORRES-GONZALEZ, *et al.*,

   Defendants.

CIVIL NO.  05-1156 (GAG/BJM)

## OPINION AND ORDER

Co-defendants Nelson Torres-González, Efraín Pérez Rodríguez, Wally Matos, Victor Cirino Dávila, Antonio Lopez Figueroa, Rey O. Martinez, José A. Resto Rodríguez, José Díaz Portalatin, Luis Delgado Cadiz, Alexis Pérez Roldán, Samuel Amaro Rivera, and Agustín Cartagena Díaz (collectively "defendants") moved for summary judgment (Docket No. 134-2), supporting their motion with a Statement of Uncontested Material Facts pursuant to Local Rule 56(b) (Docket No. 133) and exhibits (Docket Nos. 133-2 – 133-22; 146-2 – 146-22). Plaintiffs filed an opposition brief (Docket No. 138), opposed the Statement of Uncontested Material Facts (Docket No. 137), and submitted their own Statement of Contested Material Facts (Docket No. 139). The case was referred to me and the parties have consented to my jurisdiction. (Docket Nos. 98, 120, 121).

## FACTUAL BACKGROUND

This case arises from the tragic death of Noel Batista Hernández ("Batista"). Batista's family members bring this action for damages under 42 U.S.C. §1983 ("Section 1983"), and various other United States and Puerto Rico laws. The following material facts, which will be viewed in the light most favorable to plaintiffs as the nonmoving party, are either undisputed or

**Mercado-Rosa, et al. v. Torres-González, et al.**   Page 2
Civ. No. 05-1156 (GAG/BJM)
**OPINION AND ORDER**

conclusively supported by the evidentiary record.[1]

On December 8, 2003, an arrest warrant was issued against Batista for attempted murder and resisting arrest (the "attempted-murder warrant"). (Docket No. 133, ¶ 11). On December 27, 2003, Batista's father, plaintiff Noel Batista Sr. ("Mr. Batista Sr."), filed a petition for involuntary committal for Batista, who had a history of schizophrenia and serious mental illness. (Id., ¶¶ 1, 12). As a result, a bench warrant issued the same day (the "involuntary committal warrant"). (Id., ¶ 13). In early February 2004, a police officer looking for Batista in order to serve the attempted-murder warrant met with Mr. Batista Sr., who informed the agent of Batista's residential address and place of business.[2] (Id., ¶ 15). On February 10, 2004, defendant Captain Díaz Portalatin spoke with Mr. Batista Sr. to ask whether he could persuade his son to voluntarily surrender to the court. (Id., ¶¶ 17-19). Mr. Batista Sr. informed police that he would pick up his son at the Dr. Santiago Veve Calzada School (the "school") where Batista worked as a teacher. (Id., ¶ 18). Mr. Batista Sr. went to the school and tried to explain the situation to Batista and convince him to turn himself in, but Batista resisted and told his father he would not "surrender." (Id., ¶¶ 19-22). A police officer,

---

[1] In determining what facts are supported by the evidentiary record, I have applied Local Rule 56(e):

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

[2] While plaintiffs raise various arguments concerning the delay between the issuance and service of the warrant, these facts are not supported by record evidence and are not material to the claims and defenses here.

**Mercado-Rosa, et al. v. Torres-González, et al.**  Page 3
Civ. No. 05-1156 (GAG/BJM)
**OPINION AND ORDER**

defendant Agent Resto, observed the exchange, and it appeared to him that father and son "were holding a heated argument." (Id., ¶ 22). Batista then got into his vehicle and drove to the exit of the school parking lot. (Id., ¶¶ 23, 24). Batista exited his car to open the gate to the parking lot, but Agent Resto closed the gate again so that Batista could not exit. (Id., ¶ 24). At that point, Batista's father removed the keys from the starter, additional police officers arrived to the scene, and Batista "became aggressive" and grabbed a knife from his car. (Id., ¶ 25).

Defendant Captain Díaz Portalatín received a call informing him of an incident at the school involving an individual with a knife and (erroneously) a possible hostage situation, and responded to the call. (Id., ¶ 26). When Díaz Portalatin approached the gate at the school, Batista, still holding the knife, said to him not to dare enter because Batista would kill him. (Id., ¶¶ 27-28 (citing Docket No. 148-8, p. 5)).

Mr. Batista Sr. discussed with Batista the possibility of Batista being able to see his children and then voluntarily turning himself in to the police. (Docket No. 137, ¶ 30 (citing Docket No. 146-9, p. 5)). As a result, Mr. Batista Sr. accompanied Agent Resto to pick up Batista's children, who were eventually brought to the school. (Docket No. 133, ¶¶ 31-33). Meanwhile, defendant Lieutenant López, a hostage and suicide attempt negotiator, arrived at the school, checked in with defendant Commander Matos, and saw Batista carrying a "knife, brass-knuckle type and [ ] making constant feints toward all sides." (Id., ¶¶ 35-36 (citing Docket No. 146-3, p.4)). Lt. Lopez began trying to speak with Batista, who told him that he did not want to speak to anyone, that all he wanted was to go home and "get his children so they could go to heaven with him."[3] (Id., ¶ 37

---

[3] Plaintiffs contend that this fact is inadmissible hearsay. (Docket No. 137). However, Lt. López's testimony is admissible non-hearsay to the extent that it is offered not to demonstrate the truth of

(citing Docket No. 146-3, p. 4)). Around this time, Mr. Batista Sr. returned to the school with his grandchildren, who remained in a police vehicle. (Id., ¶ 38; Docket No. 137, ¶ 138). Lopez continued trying to speak with Batista, but Batista told him that he had "nothing to talk to him about," and instead entered his car, turned it on (using a spare key he carried), turned on the radio with loud music, and continued to play with the knife. (Docket No. 133, ¶ 39). Batista moved his car forward, speeding it up. (Id., ¶ 40). Lt. López informed Commander Matos that it was his view that negotiation would not be possible. (Id.).

Defendant Lieutenant Torres from the Tactical Operations Division, along with defendant Agents Escobar, Dávila, and Cirino, arrived at the scene mistakenly believing there was a hostage situation. (Id., ¶ 42). Lt. López informed Lt. Torres that there was no hostage situation, but that Batista would not surrender and it would be necessary to arrest him. (Id., ¶ 43). Lt. Torres organized a team to approach Batista, including officers carrying an anti-riot shield, tear gas, and rubber bullets. (Id.). Upon instruction from Lt. López, Lt. Torres's team approached Batista's vehicle blocking the window with the anti-riot shield and spraying tear gas. (Id., ¶ 44). In response, Batista stabbed the anti-riot shield several times with his knife. (Id.). Batista exited the car, still wielding the knife. (Id., ¶ 46). While the parties dispute Batista's intent at this point, the uncontroverted evidence demonstrates that upon exiting his car, Batista nearly stabbed the officers with the knife. (Id., ¶ 46; Docket No. 137, ¶ 46). At that point, defendant Agent Delgado shot at least four (perhaps up to twenty) rubber bullets at Batista in an unsuccessful effort to disarm him.

---

Batista's statement, but to demonstrate the effect of hearing the statement on Lt. López. See U.S. v. DeVincent, 632 F.2d 147, 151 (1st Cir. 1980) ("statements offered, not for their truth, but for their effect on the hearer" are a "familiar category of non-hearsay").

(Docket Nos. 133, ¶ 47; 137, ¶ 47).

Batista, still carrying the knife, walked toward Commander Matos. (Docket No. 133, ¶ 48). In an effort to protect Commander Matos, Agent Pérez pushed Matos away. (Id.) Pérez was then stabbed in the face with Batista's knife. (Id.) The parties dispute whether Batista intended to harm Perez or was simply disoriented from the tear gas. (Id.; Docket No. 137, ¶ 48). Other agents began to hit Batista with their clubs in an effort to make him release his knife. (Docket No. 133, ¶ 49). Agent Cirino, seeing that Batista was about to attack Agent Escobar with the knife, approached Batista. (Id., ¶ 50). In the resulting scuffle, Cirino fell backward and Batista fell forward, landing on Cirino's legs, where he proceeded to stab Cirino in the chest (where he was protected by a bullet-proof vest) and in the right gluteus. (Id., ¶¶ 50, 51; Docket No. 137, ¶ 50). In light of this situation and fearing that their colleagues were in imminent danger of death or serious bodily harm, Agents Martínez and Pérez fired two shots each at Batista. (Docket No. 133, ¶ 52). Plaintiffs dispute whether there actually was an imminent danger given the large number of police officers present at the scene. (Docket No. 137, ¶ 52). Afterwards, Batista was taken to the San Pablo Hospital, where he died the following day as a result of perforation of internal organs due to gunshots. (Docket No. 133, ¶ 53).

Batista's former wife, as legal guardian of Batista's minor children, along with Batista's father and step-mother, brought this action alleging constitutional violations and bringing claims under Section 1983 and other federal and state laws. (Docket No. 1). Defendants moved for summary judgment (Docket No. 134-2), and submitted a Statement of Uncontested Material Facts and exhibits as required by Local Rule 56(b) (Docket No. 133; 133-2 - 133-22). Defendants timely

submitted certified translations of the supporting exhibits. (Docket No. 146). Plaintiffs opposed the motion (Docket No. 138), and submitted an opposing Statement of Uncontested Material Facts (Docket No. 137), and their own Statement of Contested Material Facts (Docket No. 139). The case was referred to me and the parties have consented to my jurisdiction. (Docket Nos. 98, 120, 121).

## DISCUSSION

### I. Standard on Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining if a material fact is "genuine," the court does not weigh the facts but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] ... which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. Fed.R.Civ.P. 56(e); Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995). Instead, the nonmoving party must "set forth specific facts showing

**Mercado-Rosa, et al. v. Torres-González, et al.**                                                          Page 7
**Civ. No. 05-1156 (GAG/BJM)**
**OPINION AND ORDER**

that there is a genuine issue for trial" and support such facts with "affidavits... made on personal knowledge [that]... would be admissible in evidence." Fed. R. Civ. P. 56(e). Further, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Of course, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." Leary, 58 F.3d at 751. Still, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the claim. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**II.     Section 1983**

Section 1983 provides a cause of action for any person whose constitutional rights are violated under the color of state law. 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (internal citation omitted). A Section 1983 claim alleging excessive force in the context of an arrest, investigatory stop, or seizure of a free citizen is "most properly characterized as one invoking the protections of the Fourth Amendment." Id., 490 U.S. at 394.

In order to establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the officers' actions were not "'objectively reasonable' in light of the facts and circumstances confronting them." Id., 490 U.S. at 395, 397. In making this inquiry, the court

should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Isom v. Town of Warren, 360 F.3d 7, 11 (1st Cir. 2004) (internal citations omitted). In making this determination, "the calculus of reasonableness must make allowance for the need of police officers to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Berube v. Conley, 506 F.3d 79, 83 (1st Cir. 2007) (citing Graham, 490 U.S. at 396-97).

Defendants contend that even if a constitutional violation was committed, they are protected from liability by the defense of qualified immunity. The court applies a three-part test in evaluating the question of qualified immunity: 1) whether the facts alleged and as reflected in the record on summary judgment, taken in the light most favorable to plaintiff, amount to a violation of a constitutional right; 2) whether that constitutional right was clearly established at the time of the alleged violation; and 3) whether a reasonable officer, similarly situated, would understand that his conduct violated that right. Buchanan v. Maine, 469 F.3d 158, 167 (1st Cir. 2006). While "[i]n theory, substantive liability and qualified immunity are two separate questions ... [i]n police misconduct cases, ... the Supreme Court has used the same 'objectively reasonable' standard in describing both the constitutional test of liability ... and the Court's own standard for qualified immunity." Roy v. Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (internal citations omitted). Thus, the same "objectively reasonable" analysis may be applied to both an examination of substantive liability and the defense of qualified immunity.

The First Circuit has made clear that in considering whether police officers' actions were

**Mercado-Rosa, et al. v. Torres-González, et al.**  Page 9
Civ. No. 05-1156 (GAG/BJM)
**OPINION AND ORDER**

reasonable, it is improper for a court to look "only at the moment of the shooting." St. Hilaire v. Laconia, 71 F.3d 20, 26 (1st Cir. 1995). Rather, "the court should examine the actions of the government officials leading up to the seizure." Id. In other words, the court should "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." Id. (citing Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994)). Based on this analysis, I consider whether there is a genuine issue of material fact as to the reasonableness of the officers' actions in the events leading up to the shooting, including spraying tear gas into Batista's car and shooting rubber bullets, as well as at the moment of the shooting itself.[4]

The First Circuit has declined to find a constitutional violation in analogous cases involving the use of lethal force against individuals wielding weapons other than guns. In Isom, the police used pepper spray in an attempt to defuse a situation where the individual, Isom, was "distraught, seemingly suicidal", had briefly held two hostages, and refused to comply with officer requests that he put down the axe he wielded. 360 F.3d at 11. Instead, the pepper spray did not seem to affect Isom, who lifted his axe and charged toward the two officers. Id., 360 F.3d at 10. When he was ten feet away, the two officers fired their guns and Isom died shortly thereafter. Id. The First Circuit focused on the firing of pepper spray (and did not directly consider the reasonableness of

---

[4] Plaintiffs also challenge various other actions taken by the police leading up the shooting, arguing that it was a "highly questionable" decision to execute an arrest warrant against a school teacher during class hours and suggesting that Lt. López, the negotiator, reneged on his agreement to let Batista see his children, contending that this action "sealed Batista Jr's fate." (Docket No. 138, p.6). Plaintiffs do not provide any support for the proposition that these actions amount to constitutional violations. Plaintiffs also argue that the warrant itself arose from questionable circumstances involving a traffic stop and police brutality, but these facts are not supported with record evidence (see Docket No. 139, ¶ 1, 2) and are not directly connected to the police conduct during the February 10, 2004 seizure, which is the subject of the alleged Fourth Amendment violation here.

the moment of the shooting), finding that there was no evidence presented that would allow a jury to find that the use of the pepper spray was objectively unreasonable. Id., 360 F.3d at 12. Although one officer testified that he would not have used pepper spray, the court found this evidence insufficient because he had been in a different position than the officer who used the spray and the testifying officer further stated that it was a reasonable option for the other officer to use the spray. Id. See also Roy, 42 F.3d 696 (police did not act unreasonably in approaching and ultimately shooting a man who disobeyed repeated instructions to drop two knives, tried to kick and strike officers, and appeared capable of assault); Berube, 506 F.3d at 85 (police officer did not act unreasonably in "split-second judgment ... responding to an imminent threat" where she shot victim who threatened her with hammer).

Here, police used various tactics of lesser degrees of force prior to the shooting. Lt. Lopez, a trained negotiator, attempted to speak with Batista but determined that negotiations were unsuccessful. (Docket No. 133, ¶¶ 39, 40). The police then used tear gas and rubber bullets, and plaintiffs do not offer any evidence that these were not reasonable methods to attempt to defuse the situation. (Id., ¶¶ 43, 44). Throughout all of this, the record shows that Batista carried, played with, and swung a knife. (Id., ¶¶ 25, 39, 44). Batista stabbed an anti-riot shield and an officer before Agent Delgado shot rubber bullets at Batista. (Id., ¶¶ 44, 46-47). Batista then stabbed two other officers before Agents Martínez and Pérez opened fire. (Id., ¶¶ 48, 50-52). In doing so, they believed they were protecting the life of their colleague, Agent Cirino, who they feared was in imminent danger of death or severe bodily harm. (Id., ¶ 52).

As in previous cases declining to find Section 1983 liability, defendants made a "split-

second judgment" in responding to "an imminent threat", and their "actions cannot be found unreasonable because [they] may have failed to perfectly calibrate the amount of force required ...." Berube, 506 F.3d at 85. Plaintiffs contend that the large number of police at the scene should have been able to overpower Batista and did not necessitate the use of lethal force. However, the relevant question is not - as plaintiffs appear to argue - whether there was objectively a danger of imminent harm, but instead, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Similarly, just because "the officers had other means available to subdue" Batista, "[t]hat does not establish that the officers' actions were unreasonable." Berube, 506 F.3d at 85. Given the various methods defendants attempted to use to subdue Batista, and the imminent danger a reasonable officer would have feared prior to the use of lethal force, defendants' actions cannot be found unreasonable.

The other factors in the Fourth Amendment test further demonstrate that the officers did not violate Batista's constitutional rights. In terms of "the severity of the crime at issue," the officers were attempting to serve a warrant for attempted murder, a serious crime, and then found Batista with a dangerous weapon on the grounds of a school. See Roy, 42 F.3d at 696 (no evidence that "it would have been a better solution ... for the police to retreat, leaving an intoxicated armed man on the premises – one who had just now committed an apparent felony in the presence of the police"). Further, Batista posed "an immediate threat to the safety of the officers [and] others," being armed and on the premises of a school, and later stabbing various officers with his knife. Isom, 360 F.3d at 11. Finally, Batista was "actively resisting arrest or attempting to evade arrest

by flight" as he took out a knife and then attempted to drive away in his car after being confronted by police attempting to effectuate his arrest. See id.

Even if the shooting constituted a constitutional violation, defendants would be entitled to qualified immunity because there is no evidence that a reasonable officer could have concluded that the actions at issue violated a clearly-established constitutional right. Buchanan, 469 F.3d at 167. There is no "clearly-established" right to be free from the use of force where an individual is armed with a weapon (even if not a gun) which he directs at police and refuses to drop. See Isom, 360 F.3d at 11 (axe); Roy, 42 F.3d at 696 (two kitchen knives); Berube, 506 F.3d at 85 (hammer). In short, plaintiffs do not provide any support demonstrating that the officers' actions at any step violated a "clearly-established" constitutional right. Even if a jury could rationally find that the officers "could have done a better job" or were "mistaken" in their actions, that does not mean that their actions were unconstitutional. Roy, 42 F.3d at 695-96. See also Berube, 506 F.3d at 85 ("While one might regret [the officer's decisions], immunity encompasses mistaken judgments") (internal citation omitted).

Plaintiffs' claims for supervisory liability under Section 1983 must also be dismissed because there is no underlying constitutional violation. Camilo-Robles v. Hoyos, 151 F.3d 1, 6-7 (1st Cir. 1998) (a supervisor may be liable under Section 1983 if he formulates a policy or engages in a practice that leads to a constitutional violation committed by another).

Further, the court declines to exercise its supplemental jurisdiction over plaintiffs' state law claims. See 28 U.S.C. § 1367 (c); Rodríguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir.

Case 3:05-cv-01156-GAG-BJM   Document 149   Filed 11/17/08   Page 13 of 13

**Mercado-Rosa, et al. v. Torres-González, et al.**  Page 13
Civ. No. 05-1156 (GAG/BJM)
**OPINION AND ORDER**

1995). Therefore, plaintiffs' state law claims are dismissed without prejudice.[5]

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED**. Specifically, all federal law claims are dismissed with prejudice, and any state law claims are dismissed without prejudice.   Judgment to be entered.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th of November, 2008.

                                                        *S/Bruce J. McGiverin*
                                                        BRUCE J. McGIVERIN
                                                        United States Magistrate Judge

---

[5] Plaintiffs' reference, in the first paragraph of their amended complaint, to 42 U.S.C. Section 1981, the 13th Amendment, equal protection and due process clauses of the 14th Amendment does not adequately allege a claim under any those laws, which are not further alleged in the complaint and/or are not applicable to a police brutality case. Graham v. Connor, 490 U.S. 386 (1989) (excessive force claims arising in context of arrest or investigatory stop most properly invoke protections of the Fourth Amendment). (See Docket No. 35, p. 14-19 (alleging causes of action arising under Section 1983 and Puerto Rico laws)).